ACCEPTED
03-16-00067-CV
11192321
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/16/2016 5:19:58 PM
JEFFREY D. KYLE
CLERK

03-16-00067-CV

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/17/2016 2:55:00 PM
JEFFREY D. KYLE
Clerk

## IN THE TEXAS COURT OF APPEALS
## FOR THE THIRD JUDICIAL DISTRICT
## AUSTIN, TEXAS

_____

## LATISHA MCFADDEN,

*Appellant,*

v.

## Greg Olesky and Rogelio Sanchez,

*Appellee*

On Appeal from the 353rd Judicial District Court of Travis County, Texas

Cause No. D-1-GN-04-001222

## APPELLANT'S BRIEF

**RESPECTFULLY SUBMITTED,**

**/s/ Donald J. McCarthy**

Donald J. McCarthy
S.B. No. 00794256
The Law Office of Donald J. McCarthy
808 W. 11th Street
Austin, Texas 78701
512-585-9151
512-477-1901 (FAX)
dmccarthy@donaldmccarthylaw.com

## IDENTITY OF PARTIES AND COUNSEL

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case.

Appellant:          Latisha McFadden

Represented by:     Donald J. McCarthy

                    Law Office of Donald J. McCarthy

                    SB #00794256
                    808 W. 11th Street
                    Austin, Texas 78701
                    (512) 585-9151
                    (512) 477-1901 (FAX)
                    dmccarthy@donaldmccarthylaw.com

Appellees           Greg Olesky and Rogelio Sanchez

Represented by:     Henry Gray Laird
                    S.B.N. 24087054
                    Andralee Lloyd
                    CITY OF AUSTIN LAW DEPARTMENT
                    P.O. BOX 1088
                    Austin, Texas 78767
                    (512) 974-1342
                    (512) 974-2894 (FAX)
                    gray.laird@austintexas.gov
                    Andralee.lloyd@austintexas.gov

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been sent on June 16, 2016, to Mr. H. Gray Laird, Assistant Austin City Attorney and Ms. Andralee Lloyd, Assistant Austin City Attorney, counsel for Defendants via US Postal Service to the address indicated below.

Henry Gray Laird
gray.laird@austintexas.gov
Andralee Lloyd
Andralee.lloyd@austintexas.gov

/s/ Donald J. McCarthy
Donald J. McCarthy
ATTORNEY FOR APPELLANT

# CERTIFICATE OF COMPLIANCE

I certify that Appellant's Brief complies with the Court's word limit and is 11,207 words.

/s/ Donald J. McCarthy
Donald J. McCarthy

# TABLE OF CONTENTS

INDEX OF AUTHORITIES...............................................................................i-ii

ISSUES PRESENTED......…..................................................................................iii

STATEMENT OF THE CASE …………………………………………………… iv

STATEMENT OF FACTS…………………………………………………….... 1

SUMMARY OF THE ARGUMENTS………………………………………... 18

ISSUE ONE…………………………………………………………………... 19

ISSUE TWO…………………………………………………………………….. 36

PRAYER…………………………………………………………………… 42

# INDEX OF AUTHORITIES

**CASES:**

*Armstrong v. West Tex. Rig Co.*, 339 S.W. 69, 74 (Tex. Civ. App. – El Paso 1960, writ ref'd n.r.e)……………………………………………………………… 28

*Banda v. State,* 768 S.W. 2d 294, 296 (Tex. Crim. App. 1989)………………. 36

*Chaplinsky v. New Hampshire,* 35 U.S. 568 (1943)………………………….. 33

*Combined Am. Ins. Co. v. Blanton,* 353 S.W. 2d 847, 849 (Tex. 1962)…………. 22

*De La Paz v. State,* 279 S.W. 3d 336, 343 (Tex. Crim. App. 2009)……………. 39

*Downer v. Aquamarine Operators, Inc.*, 701 S.W. 2d 238 (Tex. 1985)……… 28

*Glover v. Henry,* 749 S.W. 2d 502, 504 (Tex. App. – Eastland 1988), no writ….29

*Goggin v. State,* 123 S.W. 3d 83, 90 (Tex. App. – Austin 2003), rev. ref'd.... 33-34

*Green Tree Financial Corp. v. Garcia,* 988 S.W. 2d 776 (Tex. App. – San Antonio 1999), no pet……………………………………………………………… 20-21

*Jimmerson v. State,* 561 S.W. 3d 5, 7 (Tex. Crim App. 1979)…………………. 33

*Kroger Tex. L.P. v. Suberu,* 215 S.W. 3d 788 (Tex. 2006)…………….. 20. 24, 25

*Lee v. Kline,* No. 14-98-00268-CV, 200 WL 19227 (Tex. App. – Houston [14th Dist.] 2000), rev. denied…………………………………………………….. 29

*Reinhart v. Young,* 906 S.W. 2d 471, 473 (Tex. 1995)……………………... 35

*Richey v. Brookshire Grocery Co.,* 952 S.W. 2d 515, 517-21 (Tex. 1996)…………………………………………………………….. 22, 24, 25

*Santellan v. State,* 939 S.W. 2d 155, 169 (Tex. Crim. App. 1997)……………….40

*Sears, Roebuck & Co. v. Menegay,* 907 S.W. 2d 72, 74 (Tex. App. – Fort Worth 1995), no writ…………………………………………………………… 39

*Texas A & M University v. Chambers,* 31 S.W. 3d 780, 783-785 (Tex. App. – Austin 2000), rev. denied…………………………………….. 26, 28, 29, 31, 35

## STATUTES AND RULES

Tex. R. Evid. 401…………………………………………………………37

Tex. R. Evid. 402…………………………………………………………37

Tex. R. Evid. 403…………………………………………………………

Tex. R. Evid. 404………………………………………………… 36. 39

## OFFICIAL STATE BAR GUIDE

Texas Pattern Jury Charge 6.4………………………………………… 20-21

## SECONDARY SOURCES

O'Connor's Texas Rules of Evidence, p. 178………………………… 38

# ISSUES PRESENTED

## POINT OF ERROR NUMBER ONE:

THE TRIAL COURT COMMITTED ERROR, ABUSED ITS DISCRETION BY ACTING WITHOUT REFERENCE TO ANY GUIDING RULES OR PRINCIPLES, AND THE ERROR RESULTED IN HARM TO PLAINTIFF BY DENIAL OF DUE PROCESS AND DUE COURSE OF LAW BECAUSE THE COURT EFFECTIVELY COMMENTED UPON THE EVIDENCE BY INSERTING AS THE FIRST JURY QUESTION AN ISSUE THAT HAS NO PLACE IN A CHARGE ON MALICIOUS PROSECUTION.  AT THE VERY LEAST, THE COURT REVERSED THE PROPER ORDER OF THE JURY CHARGE ON MALICIOUS PROSECUTION, THEREBY DENYING APPELLANT DUE PROCESS AND DUE COURSE OF LAW.

## POINT OF ERROR NUMBER TWO:

THE TRIAL COURT COMMITTED ERROR AND ABUSE OF DISCRETION BY NOT ALLOWING EVIDENCE OF A SIMILAR OR MORE SERIOUS ALLEGED CRIME COMMITTED BY DEFENDANT ROGELIO SANCHEZ BEING TREATED WITH A SOLICITOUS DRIVE TO OFFICER SANCHEZ'S HOME AND A LIGHT INTERNAL DISCIPLINARY ACTION.

## STATEMENT OF THE CASE

This is a suit by Latisha McFadden filed against Austin Police Officers Greg Olesky, Rogelio Sanchez, Michael Pollard and Tamara Joseph. The suit was filed for malicious prosecution, assault and false imprisonment. Joseph was not sued for malicious prosecution. Judge Orlinda Naranjo dismissed the Plaintiff's claims in 2009. This court in 03-09-99187-CV, *McFadden v Olesky*, *et al*, 440 S.W. 3d 646 (Tex-App – Austin 2010) no pet., confirmed the decision in par, and reversed the decision in part and remanded the malicious prosecution cliam so three Defendants remained. The case was tried in November of 2015 in Hon. Judge Orlinda Naranjo's Court. Judge Naranjo dismissed Defendant Pollard after the Plaintiff rested and the case continued against Olesky and Sanchez. After a trial before jury the jury decided in the favor of Olesky and Sanchez, 10-2. Also, final judgment was rendered on or about January 5, 2016. Appellant timely appealed this matter on or about February 4, 2016.

## STATEMENT OF FACTS

**McFadden.** Latisha Yvonne McFadden is the Plaintiff-Appellant in this case. McFadden is 5'3" 115 pounds. (RR Vol. 4 p. 34: 5 - 24). She was indicted and tried for assaulting a 6/2" 235 pound officer. She was acquitted. She is a cardiovascular surgical assistant who specializes in the surgical approach to heart procedures. (RR Vol. 4 p. 5: 5 to 6:4). She is trained in trauma, pediatric trauma, neuro, ortho, general, DBS or deep; brain stimulation with Dr. Buchanan emphasizing Parkinsons disease and Tourettes and other neurological diseases and in robotics. (RR Vol. 4 p. 6: 7 to 7:5). She has a number of certifications and degrees. (RR Vol. 4 p. 7: 6-13). She has to go through background checks and drug tests to work in her field. (RR Vol. 4:8 to 9:5). While out on bond pending her criminal trial she had to undergo many such tests. (RR Vol. 4 at 9: 2 to 10: 3). She had to report and do weekly drug tests. Id.

In 2003 she was visiting one evening with her sister and her friend Leslie Alexander and after midnight they decided to go to a club and listen to music. (RR Vol. 4 p. 10: 4 to 11: 6). Id. McFadden ordered one beer but was not able to finish it as she danced a lot and talked with her friends about "girl stuff". (RR Vol. 4 p. 11: 15 to p. 12: 17). After they left the club shortly after arriving to go back to their car Ms. McFadden hears a rude comment from a man across the street. (RR Vol. 4 p. 12: 18 to p. 14: 6). McFadden's party ultimately came to the parking lot

where the car was parked. (RR Vol. 4 p. 15:11 to 16: 10). Their friend Hoagy is standing at the back of their vehicle which is backed in. Id. McFadden talked to Hoagy but the man across the street continued to make disparaging comments. (RR Vol. 4 p. 16: 11-15). Ms. McFadden continued to be involved in this friendly discussion with Hoagy, but the guy across the street continued his harassment. (RR Vol. 4 p. 16: 11 to p. 18: 5). She curses back at the gentleman across the street and then Officer Sanchez appeared and said shut your "f…ing ass up." Id. She turns to the Officer but when she hears another negative comment from across the street and while complying with the officer's request she gives that person the finger. Id. Sanchez then grabs her arm. Id. She says the officers then "cranked" her arm up her back and pepper sprayed her. (RR Vol. 4 p. 18:9 to 19:18). McFadden then testified that as she is on the ground with pepper spray in her eyes she wants to get her arms loose to rub out the spray. (RR Vol. 4 p. 20: 3-25). She says she is screaming and while she is on the ground the officers are giving her conflicting orders. (RR Vol. 4 p. 21: 2 to 23: 19). She was beaten while she was on the ground and she felt the officers hands moving all over her. (Id).

**Alexander.** Leslie Alexander testified that McFadden went to 6th street with her. Ms. Alexander is a 20 year plus employee of the State who is a buyer for the School for the Blind. She has known Ms. McFadden since they were children, and they even get together on holidays. (RR Vol. 2 p. 5: 18-25). She said they got

to the club late, and she ordered an 8 ounce cranberry juice and Latisha ordered a beer which she did not have time to finish. (RR Vol. 2 p.6: 24 to 7: 5.) Alexander says her friend Sonya was with them. (RR Vol. 2 p. 7: 6-7). The place closed shortly after they arrived and they headed to Leslie's car at 6th and IH35. (RR Vol. 2, p. 7: 12-16). Alexander was 7 months pregnant at the time. (RR Vol. 2 p. 7: 8-11). Alexander agrees that Latisha was talking with Hoagy once they arrived at the parking lot. (RR Vol. 2 p. 7: 17 to 8: 1). They walked a short distance from the club to reach the parking lot. (RR Vol. 2 p. 8: 10-15). A lot of people were walking and a number were also talking in the parking lot. (RR Vol. 2 p. 9: 7-15). Alexander says she and McFadden heard the voice initially from across the street as they walked. (RR Vol. 2 p. 9: 19-24). As this shouting from across the street was still occurring when they reached the parking lot, police officers on bicycles "came up." (RR Vol. 2 p. 13: 3-11). Alexander says they were near her car which was in the southwest corner of the parking lot when the officers arrived. (Vol. 2 p. 13: 12-24). Alexander indicated that in addition to Hoagy and Latisha talking, there was a group of friends talking in the parking lot. (RR Vol. 2 p. 14: 2-12). Alexander was 3 feet from Latisha at this point. (RR Vol. 2 p. 14: 13-14). Hoagy and Latisha and he were having a friendly conversation. (RR Vol. 2 p. 14: 15 to 15: 21). The man across the street was now at a distance and no one was paying him any attention. (RR Vol. 2 p. 15: 24 to p. 16: 25). They had difficulty hearing the

man clearly because he was facing west. (RR Vol. 2 p. 50: 24 to p. 51:3). Officer Sanchez told Latisha to shut up and she did. (RR Vol. 2 p. 54: 7-19). Latisha gave the finger to the guy across the street. (RR Vol. 2 p. 17: 1-5).

When the first officer arrived, he did the following: (a) threw his bike down; (b) snapped his helmet off and threw it down; (c) grabbed Latisha by her wrist and twisted her arm to her back, causing her to move forward; and (d) blurted out I am going to arrest you. (RR Vol. 2 p. 17: 21 to p. 18: 5). Alexander was a couple of feet away from Latisha when she was grabbed. (RR Vol. 2 p. 19: 9-16). Alexander acknowledges that the officer yelled they needed to leave before the officer grabbed Latisha. (RR Vol 2 p. 18: 17-21). She said they did start to leave, (Vol. 2 p. 18:22 to 19: 1). Alexander says Ms. McFadden was trying to leave with her. (RR Vol. 2 p. 19: 2-8). Alexander said when the officer grabbed Latisha he twisted her arm up her back so far that it made her lean down. (RR Vol. 2 p. 19: 19-24). She said that McFadden showed a lot of pain in her face at that point. (RR Vol. 2 p. 19: 25 to 20:3). Prior to being grabbed by the officer, Alexander had observed no instance of McFadden disobeying any order from the officer. (RR Vol. 2 p. 20: 9-11). Alexander says that McFadden did not try to resist arrest. (RR Vol. 2 p. 20: 12-14). Early on the officer said that I am going to arrest you. (RR Vol. 2 p. 21: 21 to p. 22: 3). He actually arrested Latisha in front of Alexander's car, (RR Vol. 2 p. 22: 6-8). Sanchez was holding her arm so far up her back, McFadden fell down to

her knees. (RR Vol. 2 p. 22: 13-17). At this point her hands were above her head. (RR Vol. 2 p. 23:-23). When the arrest was made and her arm grabbed, McFadden fell to her knees. (RR Vol. 2 p. 2: 2-7). She said police came from everywhere on cars, bicycles, cars and even a bus came. (RR Vol. 2 p. 24: 8 to 25: 6). Alexander says the police drug McFadden across the asphalt parking lot. Id. Police surrounded her and were kicking her. Id. McFadden kicked too, but it was not at the officers but instead was an attempt to get relief from the chemical spray. Id and (RR Vol. 2 p. 58: 21-25). Alexander started to yell that McFadden was pregnant in an attempt to find something that might make them stop. Id. She said these men were kicking her and she barely weighed more than 100 pounds. Id (McFadden testified she weighed 115 pounds). According to Alexander, McFadden's kicks hit the ground and not the officers. (RR Vol. 2 p. 59: 17-19). McFadden's top came off and her breasts were exposed. (RR Vol. 2 p. 25: 16-21). No officer attempted to give her aid. Id. When the officers were kicking McFadden, another officer slammed Alexander's let in the door. Id. Horses obstructed views from the sidewalk. Id. Alexander's view after she and Sonya got inside her car became partially obstructed after the officers drugged McFadden across the parking lot. Id. They were in a huddle kicking Latisha. Id. She was dragged across the parking lot with her breasts exposed. (RR Vol. 2 p. 26: 15-23). Officers positioned themselves in front of Leslie's vehicle in order to obstruct her vision. (RR Vol. 2 p. 27: 6-14).

The horses were used to block the vision of others. (RR Vol. 2 p. 28: 19-25). The crowd was screaming and attempting to get the police to stop beating McFadden. (RR Vol. 2 p. 30: 10-22). While she was handcuffed and in the middle of the parking lot she was pepper sprayed. (RR Vol. 2 p. 32: 4-10). Ms. McFadden did kick when she was on her butt with her hands handcuffed above her head. Id. Her shoes were not on when she was kicking. (Vol. 2 p. 30: 17-18). Alexander e said they put her on her stomach and hog tied her feet to her hands with handcuffs. (RR Vol. 2 p. 34: 3-12). While this was occurring, McFadden was screaming out they are going to kill me. (RR Vol. 2 p. 34: 18-21). Alexander said that McFadden was hog-tied in the middle of the parking lot for at least 10 minutes while she continued to yell and scream. (RR Vol. 2 p. 35: 4-23). While she was sitting in the parking lot on her stomach awaiting transport, no oficer attempted to administer her aid. Id. Her breasts were fully exposed during this time period. (RR Vol. 2 p. 36: 1-2). After Ms. McFadden was loaded into the police vehicle, Alexander attempted to follow the police van but was pulled over by an officer when she exited the parking lot. She was stopped as a result of the incident. (RR Vol. 2 p. 64: 10-16).

After being stopped, Alexander and Sonya were unable to follow the van so they drove to the jail, (RR Vol. 2 p. 37: 1-10). They were informed that Ms. McFadden was not listed. Id. The police van could have gotten to the jail in less than a minute if it drove through the alley way to the jail and no more than 5

minutes if they had taken the street and driven around the block. (RR Vol. 2 p. 72: 8-13). Alexander testified that they then called their Pastor, Sterling Lands, for help. Id. They went to meet Pastor Lands early that morning. (RR Vol. p. 38: 4-9). Alexander then entered the hospital for 3 1/2 weeks. (RR Vol. 2 p. 38: 17-18). As a result of the arrest McFadden changed and is very much afraid. (RR Vol. 2 p. 39: 18 to 40: 5).

**Officers Testimony and McFadden.** Officer Rogelio Sanchez, one of the Defendant-Appellees in this case, is a 25 year officer with the Police Department. He has been commended for being in shape on his evaluations. (RR Vol. 3 p. 6 lines 2-7). He is 5'7" tall and weighs 165 pounds. (RR Vol. 3 p. 7 lines 2-7). Sanchez, the arresting officer, filed a police report that night. (RR Vol. 3 p. 7 lines 23-25). Sanchez testified that he has arrested people who are larger than him one on one. (RR Vol. 3 p. 8 lines 1-12). He acknowledges that he was physically superior to Ms. McFadden. Id. Sanchez says that McFadden was arguing with an individual in the same parking lot about 15 feet away. (RR Vol. 3 p. 8 line 20 to p. 9 line 25). He says there was no one across the street. Id. Sanchez said they never identified the man in the parking lot who they said was arguing with McFadden. (RR Vol. 3 p. 10 lines 4-9). Sanchez thought there was some relationship between McFadden and the person they said she was arguing with in the parking lot. (RR Vol. 3 p. 10 10-14). Sanchez could not hear what they were saying but they were

arguing. (RR Vol. 3 p. 10 Lines 10-25). He said it was a verbal disturbance. (RR Vol. 3 p. 11 lines 1-5). The black male in the parking lot did leave. (RR Vol. 3 page 11 lines 6-7). Sanchez, the first officer to initiate contact and the one who placed her under arrest, testified that Ms. McFadden did not assault him. (RR Vol. 3 p. 11 lines 22-24). He testified he decided to arrest McFadden because she flipped the finger at the man she was arguing with (i.e. FOR DISORDERLY CONDUCT). (RR Vol. 3 p. 12 lines 13-21). Sanchez, however, never obtained the name of the subject to determine if he was offended by the gesture. (RR Vol. 3 p. 12 lines 12-22). Sanchez admits it is important to gather all of the facts before deciding what is happening and taking action. (RR Vol. 3 p. 13 lines 19-23). Sanchez acknowledges that persons have a right to use profane language. (RR Vol. 3 p. 13 line 24 to p. 14 line 5). He further testified that this also includes the right to make an obscene gesture. Id. As far as people gathering in the parking lot. Sanchez testified this is not uncommon. (RR Vol. 3 p. 14 lines 6-14). He said that the parking lot was a public place, (RR Vol. 3 p. 14 lines 15-17). Sanchez admits they had a right to argue in the parking lot. (RR Vol. 3 p. 15 line 22 to p. 16 line 2). He said further that they had a right to even argue in the parking lot. Id. Sanchez acknowledged in his testimony that all important details should be in his report, and that he mentions nothing about how McFadden was making threats. (RR Vol. 3 p. 16 lines 3-15). He did say in his report he thought it appeared Ms. McFadden

was trying to provoke a fight. (RR Vol. 3 p. 17 lines 5-12). Sanchez admits that his order must be lawful. (RR Vol. 3 p. 18 lines 5-8). He then says the order to leave not being followed was the reason for the arres) (RR Vol. 3 p. 18 lines 9-12). Sanchez says you should not arrest someone when it simply appears that they are about to provoke a fight. (RR Vol. 3 p. 19 lines 1-4). He also testified that he could simply have given Ms. McFadden a citation. (RR Vol. 3 p. 44 lines 13-25).

Sanchez acknowledges he has special training in executing arrests. (RR Vol. 3 p. 19 lines 5-23). He says when someone pulls away like he alleges Ms. McFadden did, you re-approach and assert yourself. Id. You simply reapproach and assert your superiority. Id. Sanchez testified that Officer Olesky joined him after he says McFadden pulled away and they both attempt to put handcuffs on her. (RR Vol. 3 p. 20 lines 2-24). He says Olesky is a big man, stronger than he is, and the kind of guy you want on your side in a fight. Id. He says they finally got her to the ground. (RR Vol. 3 page 21 lines 3-12). He does not know how she was taken to the ground but his hands were on her when this was done. (RR Vol. 3 p. 21 lines 16-24). He says throughout the struggle McFadden did not hit him with her other arm. (RR Vol. 3 p. 22 lines 23-24). Sanchez also says McFadden never kicked him. (RR Vol. 3 p. 23 lines 1-2). Sanchez testified that he had a hold of her arm longer than any other officer. (Vol. 3 p. 23 lines 9-23). Sanchez acknowledges that the APD use of force policy says chemical weapons are to be used to result in

temporary dysfunction. (RR Vol. 3 p. 23 line 13 to p. 24 line 24). He says they should not be used until other efforts have failed, the suspect is volatile and resisting and they are unable to control the suspect. Id. He testified that when the chemical weapon was used, Ms. McFadden was on the ground and her arms were still being held. (RR Vol. 3 p. 24 line 25 to p. 25 line 2). He did not say in his report that Olesky was sprayed with a chemical weapon. (RR Vol. 3 p. 25 lines 3-11). Sanchez admits that APD policy requires that persons subjected to chemical weapons "as soon as they are under control" be afforded means of cleansing the chemical agent. (RR Vol. 3 p. 25 lines 15-23). He said the policy was applicable that evening. (RR Vol. 3 p. 25 lines 21-23). They had an obligation to help her cleanse the agent once she was under control. (RR Vol. 3 page 25 line 24 to p. 26 line 3). However, he admits that while she was in the parking lot she was provided no such assistance. (RR Vol. 3 page 26 lines 4-9). He disputes what Alexander says about Latisha being hog tied and says she was cuffed in a prone position. (RR Vol. 3 p. 27 lines 2-20). The officers testified that because she was so difficult to arrest it took a team of officers to subdue her. He says that once one of two arguing parties leaves there is no longer a problem. (RR Vol. 3 p. 77 lines 3-17).

Sanchez says that officers off duty should be treated the same as citizens. (RR Vol. 3 p. 29 lines 1-8). The court, however, prevents counsel from asking

questions about an off duty incident involving Sanchez, and says it will reconsider later after reading our brief. (RR Vol. 3 p. 31 line 24).

Sanchez admits his report as the arresting officer has nothing in it concerning important details such as Joseph or Olesky being struck or kicked in the stomach though they should be there. (RR Vol. 3 p. 32 lines 2-22). He acknowledges that his report was provided to the officer who prepared the probable cause affidavit as a basis for it. Id. He admits that the probable cause affidavit expressly says the reports were used as a basis for it. (RR Vol. 3 p. 32 line 23 to p. 33 line 1). He also admits meeting with the district attorney, telling them what is essentially in his report and he actually testified at Ms. McFadden's criminal trial. (RR Vol. 3 p. 33 lines 2-17). She was found not guilty of the charge. (RR Vol. 3 p. 34 lines 1-11). Sanchez also testified that there is nothing in his reports about assisting McFadden to see a nurse or McFadden saying you cannot arrest me. (RR Vol. 3 p. 44 lines 16-25). He also acknowledges that neither he nor any of the other officers includes the fact that her blouse was off and she was exposed to the public in their reports. (RR Vol. 3 p. 57 lines 16-24). However, Sanchez says he does not feel bad about leaving it out. (RR Vol. 3 p. 58 lines 11-17). He says that his report was absolutely the basis for the probable cause affidavit. Id. He met with the district attorney prior to the case being presented to the grand jury. (RR Vol. 3 p. 59 lines 12-18). And he testified consistent with his

report in the criminal case. (RR Vol. 3 p. 59 lines 19-21). Sanchez acknowledges in his testimony that he has a duty to see that justice is done and not wrongfully charge people with crimes. (RR Vol. 3 p. 60 lines 17-23). He says people do argue regularly on 6th street and they ask them to move on. (RR Vol. 3 p. 66 lines 10-15). He admits there were techniques that would permit them to subdue a resisting person such as a rear wrist lock. (RR Vol. 3 p. 69 line 8 to p. 70 line 3). Sanchez testified he never told Ms. McFadden not to give a gesture. (RR Vol. 3 p. 71 lines 6-14).

Sanchez admits that false facts cannot provide a basis for probable cause. Id. He testified that an officer can only use reasonable force. (RR Vol. 3 p. 35 lines 3-9). He acknowledges that if unreasonable force is used a citizen can fight back. Id. He acknowledges officers should follow the law and refrain from giving orders for people to leave places where they have a right to be. (RR Vol. 3 p. 35 lines 9-24). Sanchez testified that giving the finger even to an officer is not disorderly conduct. (RR Vol. 3 p. 47 lines 2-21). And he admits that the presence of law enforcement officers when there is a loud noise incident, it should be less likely that a breach of the peace would result. (RR Vol. 3 p. 47 line 22 to p. 48 line 3). He acknowledges it is appropriate for people to argue. (RR Vol. 3 p.49 lines 2-18). And in regards to the man he says was involved in the incident, Sanchez acknowledges he knows nothing about his credibility. (R Vol. 3 p. 50 lines 14-16). Sanchez testified that the

statements in his report that she was verbally and physically aggressive equals disorderly conduct. (RR Vol. 3 p. 88 lines 4-16). He says he never asked Ms McFadden what was going on prior to arresting her. (RR Vol. 3 p. 101 lines10-17).

Sanchez admits there were numerous civilian witnesses to the incident, but the officers declined to get a single name and based their allegations solely on what the officers said. (RR Vol. 3 p. 38 lines 1-16). Sanchez says he has partnered with a number of the other officers who were there that evening and that teamwork is emphasized. (RRVol. 3 p. 38 line 17 to p. 39 line 2). If another officer has a concern he will help him. (RR Vol. 3 p. 39 lines 3-11). He acknowledges that in an investigation you identify witnesses to get a full understanding of what happened. (RR Vol. 3 p. 39 line 22 to p. 40 line 8).

Officer Greg Olesky, another Defendant Appellee in this case, is a 19-year Officer of the Austin Police Department. He was a 6-year officer at the time of the incident. He was 6'2" and 235 pounds and admittedly much stronger than Ms. McFadden. (RR Vol. 5 p. 4 lines 11-13). He testified that he was far superior in terms of size and strength compared to Ms. McFadden. (RR Vol. 5 lines 23-25). He testified that the matter started with an argument between McFadden and a Black Male. (RR Vol. 5 p. 13 lines 4-15). Olesky says while this was occurring the Black Male was leaving. (RR Vol. 5 p. 14 lines 3-8). He says the man did leave but

the problem was that McFadden was still there. (RR Vol. 5 p. 15 lines 3-21). He admits that the original problem went away. Id. Olesky also says that if the arrest was because of the finger being used then it had nothing to do with anything about what she might have said to Sanchez. (RR Vol. 5 p. 63 lines 11-16). After the contact had been initiated, Olesky testified that Sanchez grabbed one of her arms and he grabbed the other. (RR Vol. 5 page 31 lines 21-25). Olesky also testified that he grabbed Ms. McFadden by the hair and took her down. (RR Vol. 5 p. 7 line 23 to p. 8 line 4). According to his report, McFadden kicked at the officers while she was standing without any reference of contact, while it says she kicked officers after she had been taken down. (RR Vol. 5 p. 8 line 23 to p. 9 line 5). He testified that he actually received training in an unspecified self-defense class which supported this hair take down move, (RR Vol. 5 page 10 lines 3-6). Olesky says after McFadden was taken to the ground he kicked her with his size 13 shoes and she was also pepper sprayed. (RR Vol. 5 p. 10 lines 7-23). He says it knocked the wind out of her so she could be handcuffed. Id. He says it took 5 officers to subdue her and at least one of the others was about his same size as he was. (RR Vol. 5 p. 50 line 21 to p. 51 line 4). He says once she was down on the ground she kicked him and caused a laceration on his leg. (RR Vol. 5 page 35 lines 4-8). McFadden testified that the shoes she was wearing would slide right off if she wasn't walking in them as they were heels with no back. (RR Vol. 4 p. 28 line 14

to p. 30 line 2) See Volume 7, Exhibit D-6). He admits that the alleged instructions to McFadden while she was down may be conflicting. (RR Vol. 5 p. 63 lines 17-23).

Olesky said in his testimony that he did lay across McFadden once while she was on the ground, putting his body weight on her. (RR Vol. 5 page 55 lines 5-12). He testified this was after she was pepper sprayed. (RR Vol. 5 page 51 lines 13-14). He acknowledges in his testimony that most people are in pain when they are pepper sprayed. (RR Vol. 5 page 53 lines 1-5). Olesky testified that Ms. McFadden was placed in a prone position after she was pepper sprayed. (RR Vol. 5 p. 45 lines 17-19). He testified that at some point he is scratched by her when she grabs his helmet while her other hand is restrained and with one hand takes the helmet off and scratches him. (RR Vol. 5 p. 53 line 22 to p. 54 line 19). Later he says he is not sure if the other hand was indeed restrained and that she did this with one hand. Id. Olesky testimony appears to acknowledge that it is possible that the use of pepper spray on someone may cause flailing. (RR Vol. 5 p. 79 lines 5-18). He does clearly acknowledge that it may cause death, however. (RR Vol. 5 p. 80 lines 10-25). Olesky also admits that once people are pepper sprayed they will bring their hands to their eyes or will want to do so if their hands are being held. (RR Vol. 5 p. 81 lines 1-5). He says that they did not have water with them at the scene to wash McFadden's eyes out but they could have gone to a nearby

establishment and gotten some. (RR Vol. 5 p. 81 line 15 to p. 82 line 14). Olesky says the Department policy and training say it should be washed out as opposed to being rubbed out. (RR Vol. 5 p. 83 lines 8-14). McFadden testified that as she was being held with her hands behind her back and sitting she was drug around while blinded. (RR Vol. 4p. 23 line to to p. 25 line 10). McFadden's ankles and wrists were touching. Id. She said that while this was occurring, someone put their hands up in her shorts. Id. McFadden said like a pretzel. (RR Vol. 4 p. 25 lines 13-19).

Olesky testified there were many people there but he took down no names of witnesses. (RR Vol. 5 page 12 lines 1-10). He did acknowledge that people were hollering at them to leave. Id. Oleskey said there was a camera but did not take any pictures at the scene such as of Ms. McFadden on the ground, her being stood up to walk to the van or of the crowd or of other matters that are in dispute. (RR Vol. 5 page 56 lines 9-23). Olesky testified that he did not see everything and it could possibly have been a benefit to have an independent witness. (RR Vol. 5 p. 84 lines 5-19).

**General.** The District Attorney and the Detective on the case were provided copies of Olesky's reports in order to bring charges against Ms. McFadden. (RR Vol. 5 page 16 lines 2-13). The probable cause affidavit specifically references the reports from Sanchez and Olesky as providing a basis for it and it says that Olesky

was the victim of the assault. (RR Vol. 7, Plaintiff's Exhibit 1). In the request for admissions, Sanchez admitted he met with the District Attorney prior to the grand jury presentation and that his original report was never changed and was used throughout the process. (RR Vol. 7). Olesky testified that the indictment in the criminal case was about assaulting him. (RR Vol. 5 page 57 lines 8-11, 21-23). Subsequently, he indicates that the charges brought by the District Attorney were based on his report, injuries and actions with Ms. McFadden. (RR Vol. 5 p. 57 lines 16-20). Further, he admits that he had the power to have the charges dropped. (RR Vol. 5 p. 57 line 21 to p. 58 line 40) McFadden said it was a very painful experience to have to prepare for and then observe the criminal court proceedings. (RR Vol. 4 p. 55 line 4 to p. 58 line 9). She had to go to multiple pre-trial appearances, watch the officers perform demonstrations in court that were false and hear the accusations about her during this process. Id. She felt like Sanchez showed a clear hatred of her and lack of respect for women during this process. Id.

## SUMMARY OF THE ARGUMENT

THE TRIAL COURT ERRED EGREGIOUSLY IN SUBMISSION OF THE JURY CHARGE, INTRODUCING AN ADDITIONAL ELEMENT TO PLAINTIFF'S CASE, ONE WHICH, AS A REBUTTED PRESUMPTION, SHOULD HAVE NEVER COME ANYWHERE NEAR THE JURY CHARGE. WHEN COMBINED WITH OTHER COMMENTS UPON THE WEIGHT OF THE EVIDENCE WITHIN THE JUROR CHARGE, THE COURT MADE IT IMPOSSIBLE FOR PLAINTIFF TO PREVAIL, WHEREAS INDICATIONS ARE THAT USING THE PATTERN JURY CHARGE WOULD HAVE RESULTED IN A DIFFERENT RESULT – AT LEAST A HUNG JURY. THE COURT ACTED WITHOUT REFERENCE TO ANY GUIDING LEGAL PRINCIPLES OR AUTHORITY.

IN ADDITION, THE COURT ABUSED ITS DISCRETION BY RULING AS INADMISSIBLE, CERTAIN VITAL, RELEVANT AND ADMISSIBLE EVIDENCE THAT WOULD HAVE HAD A MATERIAL POSITIVE EFFECT ON PLAINTIFF'S CASE, AND WHICH SHE WAS ENTITLED TO BRING FORTH BEFORE THE JURY.

THIS CASE MUST BE REVERSED AND REMANDED SO THAT PLAINTIFF MAY HAVE A FAIR DAY IN COURT ACCORDING TO DUE COURSE OF LAW.

**POINT OF ERROR NUMBER ONE**

THE TRIAL COURT COMMITTED ERROR, ABUSED ITS DISCRETION BY ACTING WITHOUT REFERENCE TO ANY GUIDING RULES OR PRINCIPLES, AND THE ERROR RESULTED IN HARM TO PLAINTIFF BY DENIAL OF DUE PROCESS AND DUE COURSE OF LAW BECAUSE THE COURT EFFECTIVELYCOMMENTED UPON THE EVIDENCE BY INSERTING AS THE FIRST JURY QUESTION AN ISSUE THAT HAS NO PLACE IN A CHARGE ON MALICIOUS PROSECUTION. AT THE VERY LEAST, THE COURT REVERSED THE PROPER ORDER OF THE JURY CHARGE ON MALICIOUS PROSECUTION, THEREBY DENYING APPELLANT DUE PROCESS AND DUE COURSE OF LAW.

**A. THE PARTIES' CORRECTION OF THE REPORTER'S RECORD AND PRESERVATION OF ERROR**

As a preliminary matter, Appellees stipulate that Appellant preserved error with respect to the insertion of the good-faith question to the extent that she objected, in a timely and plain manner, to the Court's decision to make good faith the first jury question, on the grounds that under the Pattern Jury Charge and the case law, the first jury issue must be about the tort of malicious prosecution, and she obtained an adverse ruling from the Court on her objection on the record. See Exhibit 8, Supplemental 1 Clerk's Record, which is the Stipulation of the Parties to Correction of Inaccuracies in Reporter's Record. Tex. R. App. P. 34.6(e)(1).

With respect to an objection to a jury charge, error is preserved at an informal jury conference, when the objection is timely and plainly made and a

ruling obtained. *Green Tree Financial Corp. v. Garcia*, 988 S.W. 2d 776, 780-82 (Tex. App. – San Antonio 1999), no pet. "Given the liberal precedent on preservation that has been established by the Texas Supreme Court, we reject [Appellee's] formalistic distinction between an 'informal' charge conference and a 'formal' charge conference." *Green Tree*, 988 S.W. 2d at 782.

## B. WHAT A CORRECT JURY CHARGE LOOKS LIKE

As reflected in the Texas pattern jury charge, the elements of malicious prosecution are: (1) A criminal prosecution was commenced against the plaintiff; (2) The defendant initiated or procured the prosecution; (3) The prosecution was terminated in the plaintiff's favor; (4) the plaintiff was innocent of the charge; (5) the defendant did not have probable cause to initiate or procure the prosecution; (6) The defendant acted with malice; (7) The plaintiff suffered damages as a result of the prosecution. *Kroger Tex. L.P. v. Suberu*, 215 S.W. 3d 788, 792 (Tex. 2006).

There is no "good faith" element, or "absence of good faith" element. The Court added a seventh element, and put this seventh element as the first jury question, blocking the jury from doing its duty of deciding the question of malicious prosecution.

The Texas Pattern Jury Charge on malicious prosecution reads as follows:

"Did Don Davis maliciously prosecute Paul Payne?

"'Malicious prosecution' occurs when one person initiates or procures, with malice, and without probable cause at the time the prosecution is commenced, the prosecution of an innocent person.

"'Malice' means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful or wanton act.

"'Probable cause' means the existence of such facts and circumstances as would excite belief in a person of reasonable mind, acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.

"Answer 'Yes' or 'No.'"

Texas Pattern Jury Charges 2014, PJC 6.4

Plaintiff submitted proposed jury instructions based upon the PJC and adding definitions of "initiates" and "procurement." These are the fundamental questions that must be answered. As to probable cause, if the case has made it way to the jury, then the jury must be instructed that probable cause means "whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted." *Kroger,* 215 S.W. 3d

at 792-93, citing, *inter alia*, *Richey v. Brookshire Grocery Co.*, 952 S.W. 2d 515, 517 (Tex. 1996). "Complainant" in this context means of course the party or parties who ended up as the defendant(s) in the malicious prosecution lawsuit.

## C. THE TRIAL COURT COMMITTED ERROR

Appellees requested and the court granted a jury charge that should not have been given at all, to say nothing of placing it as the first jury question. The court stood the law on its head.

As above-shown, Jury question number one should deal with the ultimate question of malicious prosecution, with definitions for "malice" and "probable cause," in essentially the same language as The Pattern Jury Charge. In the instant case, however, the Court asked the jury to first answer this question:

"Do you find from a preponderance of the evidence that any of the Defendants listed below acted in good faith while in the performance of a discretionary duty within the scope of his authority when he allegedly initiated or procured Plaintiff Latisha McFadden's criminal prosecution for assault on a peace officer?

"A person commits the offense of 'assault on a peace officer' if he or she intentionally, knowingly, or recklessly causes bodily injury to a person that he or she knows is a public servant while the public servant is lawfully discharging an official duty or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant.

"A 'discretionary act' is an act which involves personal deliberation, decision or judgment.

"An officer or public official acts in 'good faith' if a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred.

"To 'initiate' a criminal prosecution means to make a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused.

"A person 'procures' a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person fails to fully and fairly disclose all material information known or knowingly provides false information.

"An official acts within the 'scope of his authority' if he is discharging the duties generally assigned to him.

"Answer 'Yes' or 'No' for each Defendant:

a. Greg Oleskey

Answer _____

b. Rogelio Sanchez

Answer _____"

CR 236.

The jury question should never have started with a question on "good faith."  Rather, it should have started with a question on "malicious prosecution."  Malicious prosecution did not get mentioned until Question Number Two.  CR 237.

The notion of good faith is a rebuttable presumption.  The plaintiff must put forward sufficient evidence to rebut the presumption, and if she does so, the presumption dissolves completely and defendant must convince a jury that he had probable cause under the probable cause definition above-cited, from the Pattern Jury Charge and *Kroger*.  If Defendants lose the presumption of good faith, as they did in this case, they do not get a jury charge on it.

The controlling case on this is *Richey v. Brookshire Grocery Co.*, 952 S.W. 2d 515 (Tex. 1996).  The facts of this case were that Richey pocketed a package of cigarettes while shopping, bought his groceries paying $51.75, saw a charity bin on the way out of the grocery store, went back and bought $8.89 worth of baby food and put in the bin and walked out of the store.  When the night manager stopped him outside and mentioned the cigarettes in Richey's pocket, Richey offered to pay for them.  The night manager instead reported him to police for shoplifting.  A

criminal jury took a few minutes to find Richey not guilty. The civil jury in the

malicious prosecution case found in his favor. The Appellate Court overruled in a

split decision, and its ruling was upheld 5-4 by the Supreme Court. The majority

ruled that the grocery store met the probable cause standard of "whether complaint

reasonably believed that the elements of a crime had been committed based on the

information available to the complainant before criminal proceedings

began." *Richey*, 952 S.W. 2d at 519-20. The minority opinion argued that Richey

put on sufficient evidence to support the verdict. *Id*. at 520-21 (Cornyn, J.

dissenting). This is by way of background. For purposes of the case at bar, the

entire court agreed regarding the role of the good-faith presumption.

> "There is an initial presumption in malicious prosecution actions that the
> defendant acted reasonably and in good faith and had probable cause to
> initiate the proceedings. That presumption disappears once a plaintiff
> produces evidence that the motives, grounds, beliefs, and other evidence
> upon which the defendant acted did not constitute probable cause. The
> burden then shifts to the defendant to offer proof of probable cause."

*Id*. at 517-18.

The presumption is a presumption of good faith and probable cause. When

evidence sufficient to put into doubt whether defendants had probable cause is

brought forward, the presumption falls away. That is to say, the presumption

of ***good faith and probable cause*** fall away. Once they do, the defendant must

offer proof of probable cause. The question of a police officer's "good faith" is not

on the table any longer. The language of the law at this point becomes the much more neutral "probable cause." The juror as fact finder does is not forced to say a police officer did not act in "good faith." The jury is merely asked if the officer has probable cause. For the juror, this is a momentous difference. It makes all the difference in the world, and certainly all the difference to turn a case. Although the definitions are similar, one phrase is psychologically loaded. By definition it forces a jury to decide that a police officer acted in bad faith before even considering the elements of malicious prosecution, rather than simply asking the jury to decide whether the officer made a bad mistake. This is an immense hurdle for the Plaintiff to overcome – a hurdle that is completely unnecessary, and completely illegal. "An instruction that misstates the law cannot be expected to produce a correct verdict." *Texas A & M University v. Chambers*, 31 S.W. 3d 780, 785 (Tex. App. – Austin 2000), rev. denied.

As soon as positive evidence to the contrary is produced, a presumption is rebutted. *Chambers*, 31 S.W. 3d at 784.

Appellant put on sufficient evidence to rebut the presumption and make probable cause a fact issue upon which Appellees had the burden of proof, as per *Richey*. The Trial Court denied Appellees' Motion for a Directed Verdict, thereby ruling as a matter of law that the presumption was rebutted. Exhibit 1, Final Judgment, CR 260-61.

Had it not denied the motion for directed verdict, the Trial Court would have had to grant Appellees' Motion for Directed Verdict, which Motion the Trial Court denied. Had it not, Appellees would have been entitled to a judgment as a matter of law. But the Trial Court did not grant dismissal as a matter of law, but instead sent the case to the jury to decide as fact finder. Exhibit 1. This, by itself, shows that the presumption was overcome and "good faith" should never have been mentioned in any part of the jury questions or the Court's Charge as a whole.

The syllogism is a very simple one:

1. Without sufficient rebutting evidence to create a jury issue regarding probable cause, Appellees would have been entitled to judgment as a matter of law – the granting of their Motion for a Directed Verdict.

2. Having denied Appellees a judgment as a matter of law, the Trial Court's duty was to present a correct series of jury questions covering the elements of malicious prosecution, as per the Pattern Jury Charges or something similar.

3. "Good faith" or lack thereof is not one of the elements (jury questions) of malicious prosecution.

4. Therefore, it was error to give a jury instruction and question on "good faith."

The Trial Court was, of course, correct in denying the motion for a directed verdict as a matter of law. The testimony of bystander Leslie Alexander set forth sufficient evidence to overcome the presumption of good faith. RR Vol. 2, at 13:12 – 17:20. Appellant's testimony raised evidence to rebut the presumption. RR Vol. 4 at 12:19 – 18:4. Additionally, the testimony

of Appellees was evidence sufficient to overcome the presumption of good faith. The Statement of Facts just recited is full of admissions from the Appellee Officers that amounted to competent evidence rebutting the presumption of good faith.

What the Court did instead was to rule that the presumption had been overcome. But in contradiction to her own ruling, and in clear legal error, presented this non-element to the jury as the first question to be answered. This amounted to a misstatement of the law and therefore a denial of due process and due course of law. It also amounted to a comment on the evidence, as will be explained below.

## D. STANDARD OF REVIEW – THE COURT ACTED WITHOUT REFERENCE TO ANY GUIDING RULES OR PRINCIPLES.

Courts enjoy considerable discretion in framing a jury charge. *Texas A & M University v. Chambers,* 31 S.W. 3d 780, 783 (Tex. App. – Austin 2000). The reviewing court may only determine whether the trial court acted without reference to any guiding rules or principles. *Chambers*, 31 S.W. 3d at 783, citing *Downer v. AquamarineOperators, Inc.,* 701 S.W. 2d 238, 241-242 (Tex. 1985).

Still, an instruction must be correct. *Id.* "A presumption 'may not properly be the subject of an instruction to the jury.'" *Id*. at 783-84, citing, *United Founders Life Ins. Co.v. Carey*, 347 S.W. 2d 295, 307 (Tex. Civ. App. – Austin

1961), rev'd on other grounds, 36 S.W. 2d 236 (Tex. 1962); *Armstrong v. West Tex. Rig Co.*, 339 S.W. 69, 74 (Tex. Civ. App. – El Paso 1960, writ ref'd n.r.e); *Glover v. Henry*, 749 S.W. 2d 502, 504 (Tex. App. – Eastland 1988, no writ).

"A presumption is an artificial thing, a mere house of cards, which one moment stands with sufficient force to determine an issue, but at the next, by reason of the slightest rebutting evidence, topples utterly out of consideration of the trier of facts." *Id.*, citing *Combined Am. Ins. Co. v. Blanton*, 353 S.W. 2d 847, 849 (Tex. 1962). See also *Lee v. Kline*, No. 14-98-00268-CV, 200 WL 19227, *3 (Tex. App. – Houston [14th Dist.] 2000), rev. denied.

"An artificial thing."

"Topples utterly out of consideration of the trier of facts."

Not in the instant case. Only slightly less egregiously than in *Chambers*, the Trial Court in the instant case made the good-faith presumption a very real thing and improperly forced the jury to make it its first – and ultimately only – consideration. In *Chambers*, the trial court improperly inserted the actual presumption into the jury charge. Here, what the Court did was to make a policeman's "good faith" a roadblock through which the jury could not pass to get

to the question it was supposed to consider.  We can see how this occurred in three ways:

**1.**  By insisting on putting a policemen's "good faith" at issue as opposed to merely their reasonableness in determining probable cause, the Court forced the jury to not simply judge that the police officers were plain wrong, but that they had acted in bad faith.  This is something which the neither the PJC nor *Kroger* or any authority requires or allows.

**2.**  We know the jury was unable to find its way past the roadblock because it told the Court that it could not figure out if the good-faith definition referred to "the officer's conduct during the arrest or after the arrest when completing the incident reports."  CR p. 259.  The jurors' confusion is very understandable.  This extra-legal question on good faith, coming as it did out of thin air, without reference to any guiding rules or principles, was also unintelligible to the average layperson.

Look please at Question No. 1 in its entirety (CR, p. 236, Exhibit 2).  The first paragraph of the question talks about good faith when the officer initiated or procured the criminal prosecution.  But when read in combination with the "procures" definition, any layman would be confused because of the language that reads, "if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred."  To a laywoman that could seem to refer

to the officer's actions on the street, or making the arrest, but not the decision to recommend a formal charge against Appellant. But it only gets worse. The fourth paragraph of Question No. 1 defines "good faith" as being if a reasonably prudent officer "could have believed that his conduct was justified based on the information he possessed when the conduct occurred." "When the conduct occurred" could mean either the incident on the street, or the arrest, or the decision to recommend that formal charges be brought. The Court's reaction to this query was that the jury had to proceed on the jury charge with no additional explanation. CR p 259.

**3.** The overall actions of the Court put the case on par with *Chambers*. In *Chambers*, this Court found that the improper charge probably caused the rendition of an improper verdict. This was because the charge was an improper comment on the weight of the evidence. *Chambers* at 785. It is acknowledged that the Court in the instant case did not recite the presumption in the jury charge. However, for some of the same reasons as in *Chambers*, and additional reasons, the Court's extra-legal Question No. 1 also likely led to an improper judgment.

"Reversal is required if an improper comment on the weight of the evidence was calculated to cause the rendition of an improper judgment . . . An instruction that misstates the law cannot be expected to produce a correct verdict." *Id*.

Looked at as a whole, Question No. 1 was clearly an improper comment on the weight of the evidence.

Firstly, we have the mere fact that good faith was brought up at all. This has no legal precedent in this State. Appellant has checked and double-checked on both Westlaw and Lexis and finds no reported case where "good faith" is any part of the Jury Charge on malicious prosecution. None. The inclusion of this good-faith charge, which never had any place in a jury charge on malicious prosecution, was a comment on the weight of the evidence.

Secondly, the Court inserted a definition of "assault on a peace officer" as the second paragraph of Question No. 1. Such definition was in no way necessary even under the terms of the Court's eccentric Question No. 1. Its inclusion amounted to a comment upon the weight of the evidence. It is a particularly heavy comment when the Court ignores the qualifying language of Tex. Pen. C §9.31, which allows citizens self-defense against an officer in instances of alleged Class C misdemeanors and police excessive force. This, even though Officer Sanchez agreed that the law states that a citizen can fight back if a police officer uses excessive force. RR Vol 3, p 35: 6-9

Thirdly, when Appellant, having been overruled on her objection to the order in which the Jury Questions would proceed, attempted then to inform the

jury of what a "good faith police officer" should know regarding the alleged underlying offense that started the entire police fracas, she was refused by the Court. The Statement of Facts makes clear that the initial reason for the police stop of Latisha McFadden was a Class C Disorderly Conduct. But the S.O.F. also shows strong evidence that such Class C Disorderly Conduct was never committed by Appellant.

And the law shows that no reasonably prudent officer could have been justified in taking the violent action they did against Ms. McFadden because her conduct never even approached conduct sufficiently disorderly to be considered disorderly conduct.

Appellant duly filed a Supplemental Jury-Charge Requests to put this good-faith subterfuge in context. The law requires that when a requested jury instruction is denied, Appellant should have filed a written proposed charge, which was done in this case. CR 229-31.

Appellant asked the Court to include in its Question No. 1 each or any of three explanations of the parameters of disorderly conduct – explanations clearly admonitory toward law enforcement. These were:

> "For words or gestures to amount to disorderly conduct, or a breach of the peace, they must, by their very utterance tend to incite an immediate breach of the peace." *Jimmerson v. State*, 561 S.W. 3d 5, 7 (Tex. Crim. App. 1979)

(Onion, J. for a unanimous Court), citing *Chaplinsky v. New Hampshire*, 35 U.S. 568 (1943)

"Whether particular words constitute fighting words is a question of fact.  This requires careful consideration of the actual circumstances surrounding the expression, asking whether the expression is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Goggin v. State*, 123 S.W. 3d 82, 90 (Tex. App. – Austin 2003, rev. ref'd), citing *Texas v. Johnson*, 491 U.S. 397 (1989)

"Language that is merely harsh and insulting does not generally rise to the level of fighting words; derisive or annoying words only rise to such level when they plainly tend to excite the addressee to a breach of the peace." *Goggin v. State*, 123 S.W. 3d 83, 90 (Tex. App. – Austin 2003, rev. ref'd).

After an exchange of arguments, trial Court denied this motion to include Texas law pertaining to disorderly conduct.   This law likely could have changed some jurors' minds by showing them that the police cannot just call a profanity or profane gesture disorderly conduct unless it likely to incite imminent lawlessness and immediate breach of the peace.   RR Vol. 6 at 7:5 to 10:7.

Fourthly, the Third Court of Appeals is more inclined to remand a case for improper comment on the weight of the evidence if it is a close case.   The Statement of Facts to this Brief show this was a close case, vigorously contested, with many pieces of evidence that might have cause a jury to find malicious prosecution had it not been stopped by the good-faith roadblock.

The jury barely brought in a decision.  Two jurors dissented.  CR, p. 243.

The undersigned believes Appellees will agree the jury deliberated close to five hours over the single question of good faith, the question designed to through it off course.

"A superfluous instruction is more likely to improperly influence a jury in a close case." *Chambers* at 785, citing *Reinhart v. Young*, 906 S.W. 2d 471, 473 (Tex. 1995).

## CONCLUSION and PRAYER

Appellant pray that this Honorable Court reverse and remand the instant case with instructions to the Trial Court to follow PJC 6.4, except in case of exceptional, unlikely circumstances and in which case it make findings of fact and law supporting deviation from PJC 6.4.

**POINT OF ERROR NUMBER TWO. THE TRIAL COURT COMMITTEE ERROR AND ABUSE OF DISCRETION BY NOT ALLOWING EVIDENCE OF A SIMILAR OR MORE SERIOUS ALLEGED CRIME COMMITTED BY DEFENDANT ROGELIO SANCHEZ BEING TREATED WITH A SOLICITOUS DRIVE TO OFFICER SANCHEZ'S HOME AND A LIGHT INTERNAL DISCIPLINARY ACTION.**

A. STANDARD OF REVIEW

In a civil proceeding, the standard of review on evidentiary rulings is abuse of discretion. *Bay Area Healthcare Grp., Ltd., v. McShane*, 239 S.W. 3d 231, 234 (Tex. 2007). Reversal is warranted only if the error is harmful." *Nissan Motor Co. v. Armstrong*, 145 S.W. 3d 131 144.

The instance involving internal discipline of Rogelio Sanchez in 1999 for criminal trespass is not a 404(a) question. It is offered for a wholly other purpose. The purposes enumerated in 404(b) are illustrative, not exclusive. The 404(b) catalogue, by the same token, is illustrative, not exclusive. Whether or not it neatly fits one of these categories, an extraneous transaction will be admissible so long as it logically tends to make the existence of some fact of consequence more or less probable. *Banda v. State*, 768 S.W. 2d 294, 296 (Tex. Crim. App. 1989) (emph. added).

In this case the matter is offered to show that the APD was capable and frequently did approach similar or far worse situations with a much lower level of force, amounting to zero. Because the two situations – Officer Sanchez's

alleged misdemeanors and Ms. McFadden's – this is a factor to be considered in favor of admitting the Sanchez information. Secondly, the two instances have fundamental features in common. Sanchez was alleged by the owner of the Tavern pub in Austin to have been involved in a "disturbance" which is not explained in the report. Meanwhile, in Sanchez's post-hoc justification for his treatment of plaintiff he also says that Ms. McFadden was on the verge of creating a disturbance. RR Vol. 3 at 5:22-24.

This evidentiary issue is actually a classic Rule 402 case.

Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Plaintiff's Exhibit 36, the discipline of Rogelio Sanchez, shows that where a crime clearly was committed (criminal trespass) and another possibly committed (disorderly conduct – "involved in a disturbance"), the APD reacted by taking Officer Sanchez home, not jail, and no charges were brought.

Rule 401 defines relevance and 402 says relevant evidence generally is admissible. There is a two-part test:

1. "Materiality" inquires whether there is an rational relationship or pertinence of the proffered evidence to any provable or controlling fact issue in dispute.

2. Then, relevancy inquires whether the proffered evidence has probative value tending to establish the presence or absence, truth or falsity, of a fact.

O'Connor's Texas Rules of Evidence, p. 178

What counts is the probative value tending to establish the presence or absence, truth or falsity of a fact, which fact has a rational relationship to the controlling fact in dispute. The controlling fact in dispute is whether there was a malicious prosecution against Latisha McFadden or conspiracy to maliciously prosecute her. Plaintiff's theory is that Defendants motive to maliciously prosecute plaintiff was to cover up excessive use of force, irrespective of any alleged disorderly conduct. One piece of probative evidence that this was excessive force was the fact of the gentle, solicitous way in which Rogelio Sanchez was treated when he committed a "disturbance" or disorderly conduct, and allegedly committed the Class B offense of criminal trespass.

The degree of similarity between the two events or transactions does not need to be high. *Sears, Roebuck & Co. v. Menegay*, 9-7 S.W. 2d 72, 74 (Tex. App. – fort Worth 1995, no writ).

As mentioned the 404(b) list is not exhaustive, by its own terms. What is required is that the proponent of the evidence "must be able to explain to the trial court the logical and legal rationales that support its admission on a basis other than bad character" or propensity purpose. *De La Paz v. State*, 279 S.W. 3d 336, 343 (Tex. Crim. App. 2009)

The test is as follows:

1. The inherent probative value of the evidence (very high in the instant case to show disturbances can be diffused without any resort to arrest, much less violent, unlawful arrest);

2. The similarity of the instances (both were lowest-level misdemeanors, occurring close in time, both involved what were described as "disturbances" and in both cases the actor reportedly used strong, foul language.)

3. Strength of the evidence of the extraneous (Sanchez) offense (strong).

4. Nature of the extraneous conduct and its potential for impressing the jury in irrational ways (low). Limiting instruction and responsible jurors understand the real issues in the case.

5. Trial time necessary to develop the evidence (minimal).

6. Availability of other evidence that tends to accomplish the same purpose (there is no other such evidence in possession of plaintiff).

7. Strength of that other evidence that tends to accomplish the same purpose (such other evidence does not exist, at least not in Plaintiff's possession).

8. Is the purpose served by admission of the extraneous conduct related to a disputed issue (YES). The disputed issue is should the police have conducted the entire procedure, if any was needed, by a much lower level of force, and was the cover-up of excessive force a motivating factor in the malicious prosecution.

> *Santellan v. State*, 939 S.W. 2d 155, 169 (Tex. Crim. App. 1997).

The "*Santellan* score" is extremely high. It was even higher because the judge ended up inventing a good-faith question. The Court will remember the question: "Do you find from a preponderance of the evidence that any of the Defendants listed below acted in good faith while in the performance of a discretionary duty within the scope of his authority when he allegedly initiated or procured Plaintiff Latisha McFadden's criminal prosecution for assault on a peace officer."

Even with this prejudicial comment upon the weight of the evidence, had the jury heard the evidence on how the Rogelio Sanchez alleged criminal trespass and disorderly conduct were handled, the jury would have had a far different standard of good faith. And had the expected charge based on the PJC been given, the actions toward Sanchez would have informed the jury with regards to what a "reasonably prudent officer" should do in such low-level situations. The evidence was of extreme importance and violated no rules.

The Trial Court sustained the City's objection to the admission of the evidence. RR. Vol 1, Excerpt of Proceedings, 10:7 – 14

## CONCLUSION AND PRAYER

The Trial Court did not follow guiding principles of law and did not do a proper balancing test and this was highly prejudicial to Plaintiff's case for it would have shown that none of what happened to her ever needed to happen, the force was brutally excessive for the level of alleged misdemeanor and there existed a double standard, all motives for malicious prosecution. The Court should reverse and remand for a new trial because of this denial of vital evidence.

**PRAYER**

For the reasons stated in the Conclusion and Prayer to Points of Error Nos. 1 and 2, Appellant Prays that this case be reversed and remanded back to the trial court for a new trial.

**<u>APPENDIX</u>**

1.  FINAL JUDGMENT

2.  CHARGE TO THE JURY

3.  TEXAS PATTERN JURY CHARGES

4.  TEXAS RULES OF EVIDENCE, RULE 401

5.  TEXAS RULES OF EVIDENCE, RULE 402

6.  TEXAS RULES OF EVIDENCE, RULE 403

7.  TEXAS RULES OF EVIDENCE, RULE 404

8.  STIPULATION OF THE PARTIES TO CORRECTION OF INACCURACIES IN THE REPORTER'S RECORD

# Appendix

# Exhibit 1

CAUSE NO. D-1-GN-04-001222

| | | |
|---|---|---|
| LATISHA MCFADDEN, | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| GREG OLESKY, ROGELIO SANCHEZ, | § | |
| and MICHAEL POLLARD, | § | |
| Defendants. | § | 353RD JUDICIAL DISTRICT |

## FINAL JUDGMENT

On the 16TH day of November, 2015, the above entitled and numbered cause came on for trial. Plaintiff appeared through her attorneys of record and Defendants appeared through their attorneys of record. The parties announced ready for trial, and a jury of twelve persons and one alternate was empaneled to try the cause.

At the conclusion of Plaintiff's evidence, Defendants moved for a directed verdict. The Court considered the motion and the evidence and found that Defendants Oleskey and Sanchez were not entitled to a directed verdict. However, the Court found that Defendant Pollard was entitled to a directed verdict. As such, the Court **DENIED** Defendants Oleskey and Sanchez' motion for directed verdict and **GRANTED** Defendant Pollard's motion for directed verdict. As such, Plaintiff shall take nothing from Defendant Pollard and all claims against Defendant Pollard are hereby **DISMISSED WITH PREJUDICE**. At the conclusion of Defendants' evidence, Defendants re-urged their motion for directed verdict as to Defendants Oleskey and Sanchez, which the Court **DENIED**. Defendants' motion for directed verdict and the Court's order on Defendants' motion for directed verdict are incorporated herein for all purposes by reference.

1



004379672



260

The parties closed the submission of evidence on November 19, 2015, and the Court submitted the case to the jury. In response to the Court's charge, the jury returned a verdict that the court received, filed and entered of record. The questions submitted to the jury and the jury's verdict are attached as Exhibit A and incorporated by reference. The charge of the Court and the verdict of the jury are incorporated herein for all purposes by reference.

After the jury returned its verdict, Defendants moved for judgment on the verdict. The Court, having considered the motion of Defendants, and because the verdict of the jury was for Defendants and against Plaintiff, finds that judgment should be rendered on the verdict in favor of Defendants and against Plaintiff.

Accordingly, IT IS, THEREFORE, ORDERED that Plaintiff TAKE NOTHING by her suit, and that each party shall bear their own costs of court.

This judgment finally disposes of all parties and all claims and is appealable.

SIGNED this 5 day of ~~December, 2015.~~ January 2016

HON. ORLINDA NARANJO
JUDGE PRESIDING

Presented by:

H. GRAY LAIRD III
ATTORNEY FOR DEFENDANTS

GARY BLEDSOE
ATTORNEY FOR PLAINTIFF

2

261

# Exhibit 2

CAUSE NO. D-1-GN-04-001222

LATISHA MCFADDEN, Plaintiff

v.

GREG OLESKEY, AND
ROGELIO SANCHEZ, Defendants

IN THE DISTRICT COURT

OF TRAVIS COUNTY, TEXAS

353RD JUDICIAL DISTRICT

## CHARGE TO THE JURY

MEMBERS OF THE JURY:

1.    This case is submitted to you by asking questions about the facts, which you must decide from the evidence admitted in this trial.

2.    In arriving at your answers, consider only the evidence, including exhibits, admitted in this trial.

3.    In considering this evidence, you are bound to follow the law set forth in this charge, as well as all instructions concerning jurors' conduct that you have been given.

4.    You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

5.    Do not let bias, prejudice, or sympathy play any part in your deliberations.

6.    Do not become a secret witness by telling other jurors about other incidents, experiences, or lawsuits. Do not tell other jurors about any special knowledge, information, or expertise that you may have. You must confine your deliberations to the evidence admitted in the trial.

7.    This charge includes all legal instructions and definitions that are necessary to assist you in reaching your verdict, so do not seek out any information in law books or dictionaries.

**SCANNED**

1

8.      All of the questions and answers are important. No one should say that any question or answer is not important.

9.      Do not decide who you think should win and then try to answer the questions accordingly. Simply answer the questions, and do not concern yourselves with the effect of your answers.

10.     Do not decide the questions by any method of chance.

11.     Do not answer the questions by adding together each juror's figure and dividing by the number of jurors to get an average.

12.     Do not do any trading on your answers. That is, one juror must not agree to answer one question a certain way if other jurors will agree to answer another question another way.

13.     After you retire to the jury room, you will select a presiding juror. You will then deliberate upon your answers.

14.     It is the duty of that presiding juror:
   a.      to preside during the deliberations and to provide order and compliance with the charge;
   b.      to write, sign, and deliver to the court clerk any communication to me;
   c.      to conduct the vote and to participate in that vote; and,
   d.      to write your answers in the spaces provided.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

15.     The answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer to all the questions, including subparts, unless otherwise instructed. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

16.     If the verdict is reached by unanimous agreement, the presiding juror will sign the verdict on the certificate page for the entire jury.

2

233

17. If 10 jurors agree on every answer, those 10 jurors sign the verdict. If 11 jurors agree on every answer, those 11 jurors sign the verdict. If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

18. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 or 11 who agree on every answer will sign the verdict.

19. During your service as jurors, if you observe a violation of my instructions outside the jury room, by either a juror or any other person, you must report that to me.

20. In your deliberations, any juror who observes a violation of my instructions shall point out the violation and caution the offending juror not to violate the instructions again.

21. You must not discuss the case with anyone, including other members of the jury, unless all of the jurors are present and assembled in the jury room. If anyone other than a juror tries to talk to you about the case before you reach a verdict, tell me immediately.

22. When all required questions have been answered, the presiding juror has written your answers on the charge, and the verdict has been signed, you will summon the court operations officer and be returned to court with your verdict.

When words are used in this charge in a sense which varies from the meaning commonly understood, you are given a proper legal definition, which you are bound to accept in place of any other meaning.

Answer "Yes" or "No" to all questions unless otherwise instructed. A "Yes" answer must be based on a preponderance of the evidence unless otherwise instructed. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No".

The term **"PREPONDERANCE OF THE EVIDENCE"** means the greater weight and degree of credible testimony or evidence introduced before you and admitted in this case. A preponderance of the evidence is not measured by the number of witnesses or by the number of

documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not.

A fact may be established by **"DIRECT EVIDENCE"** or by **"CIRCUMSTANTIAL EVIDENCE"** or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

_November 20, 2015_
DATE

_Orlinda L. Naranjo_
JUDGE ORLINDA L. NARANJO,
Presiding Judge

4

235

## QUESTION NO. 1

Do you find from a preponderance of the evidence that any of the Defendants listed below acted in good faith while in the performance of a discretionary duty within the scope of his authority when he allegedly initiated or procured Plaintiff Latisha McFadden's criminal prosecution for assault on a peace officer?

A person commits the offense of "assault on a peace officer" if he or she intentionally, knowingly, or recklessly causes bodily injury to a person that he or she knows is a public servant while the public servant is lawfully discharging an official duty or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant.

A "discretionary act" is an act which involves personal deliberation, decision or judgment.

An officer or public official acts in "good faith" if a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred.

To "initiate" a criminal prosecution means to make a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused.

A person "procures" a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person fails to fully and fairly disclose all material information known or knowingly provides false information.

An official acts within the "scope of his authority" if he is discharging the duties generally assigned to him.

Answer "Yes" or "No" for each Defendant:

a. Greg Oleskey

Answer: __YES__

b. Rogelio Sanchez

Answer: __YES__

236

If you answered "No" to Question No. 1 as to either Defendant, answer the following questions as to that Defendant only. Do not answer the following questions for any Defendant for whom your answer was "Yes" in Question No. 1.

## QUESTION NO. 2

Did any of the Defendants listed below maliciously prosecute Plaintiff Latisha McFadden?

"Malicious prosecution" occurs when one person initiates or procures, with malice, and without probable cause at the time the prosecution is commenced, the prosecution of an innocent person.

To "initiate" a criminal prosecution means to make a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused.

A person "procures" a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person fails to fully and fairly disclose all material information known or knowingly provides false information.

"Malice" means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful and wanton act.

"Probable cause" means the existence of such facts and circumstances as would excite belief in a person of a reasonable mind, acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were initiated.

Answer "Yes" or "No" for each Defendant:

a. Greg Oleskey

Answer: _____

b. Rogelio Sanchez

Answer: _____

6

237

If you answered "Yes" to Question No. 2 for either of the Defendants named below then answer Question No. 3. Otherwise, do not answer Question No. 3.

## QUESTION NO. 3

Were any of the Defendants listed below part of a conspiracy to maliciously prosecute the Plaintiff that damaged Plaintiff Latisha McFadden?

To be part of a conspiracy, a Defendant and another person or persons must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Plaintiff Latisha McFadden. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.

Answer "Yes" or "No" for each defendant:

a. Greg Oleskey

Answer: _____

b Rogelio Sanchez

Answer: _____

238

If you answered "Yes" to Question No. 2 or Question No. 3 for more than one of those named below, then answer Question No. 4. Otherwise, do not answer Question No. 4.

## QUESTION NO. 4

Assign percentages of responsibility only to those you found caused or contributed to cause, or conspired to cause the damages. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found.

For each Defendant you found caused or contributed to cause the damages to Plaintiff Latisha McFadden, find the percentage of responsibility attributable to each:

1. Greg Oleskey          _____%
2. Rogelio Sanchez        _____%

   TOTAL:          100%

If you answered Question No. 2 or Question No. 3 "Yes" then answer Question No. 5. Otherwise do not answer Question No. 5.

## QUESTION NO. 5

What sum of money, if paid now in cash, would fairly and reasonably compensate Plaintiff Latisha McFadden for her damages, if any, that resulted from the malicious prosecution and/or conspiracy to commit malicious prosecution, if any?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

You are instructed that any monetary recovery for the elements listed below is not subject to federal income taxes.

a.    Physical pain sustained in the past: $_____

b.    Mental anguish sustained in the past: $_____

c.    Mental anguish that, in reasonable probability, Latisha McFadden will sustain in the future: $_____

d.    Monies paid to a bail bond company: $_____

e.    Attorney fees incurred in defending the underlying criminal case: $_____

9

240

Answer Question No. 6 regarding each Defendant listed only if you unanimously answered "Yes" for that Defendant in Question No. 2 or Question No. 3. Otherwise, do not answer Question No. 6 for that Defendant.

To answer "Yes" to Question No. 6, your answer must be unanimous. You may answer "No" to any part of Question No. 6 only upon a vote of ten (10) or more jurors. Otherwise, you must not answer that part of Question No. 6.

## QUESTION NO. 6

Do you find by clear and convincing evidence that the harm to Plaintiff Latisha McFadden resulted from malice on behalf of any of the Defendants listed below?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Malice" means:

1. A specific intent by any of the persons listed below to cause substantial injury to Plaintiff Latisha McFadden; or

2. An act or omission by any of the persons listed below,

    a. Which when viewed objectively from the standpoint of the person listed below at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

    b. Of which the person listed below has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Answer "Yes" or "No" for each Defendant listed below:

a. Greg Oleskey

Answer: _____

b. Rogelio Sanchez

Answer: _____

10

241

Answer Question No. 7 regarding each Defendant named below only if you unanimously answered "Yes" to Question No. 6 regarding that Defendant. Otherwise, do not answer Question No. 7 for a particular Defendant.

## QUESTION NO. 7

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, should be assessed against each Defendant named below and awarded to Plaintiff Latisha McFadden as exemplary damages for the conduct found in response to Question No. 6?

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages includes punitive damages.

Factors to consider in awarding exemplary damages, if any, are:

1. The nature of the wrong.

2. The character of the conduct involved.

3. The degree of culpability of the wrongdoer.

4. The situation and sensibilities of the parties concerned.

5. The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any, for each Defendant:

a. Greg Oleskey

Answer: $ _____

b. Rogelio Sanchez

Answer: $_____

11

242

## CAUSE NO. D-1-GN-04-001222

| | |
|---|---|
| LATISHA MCFADDEN, Plaintiff | IN THE DISTRICT COURT |
| v. | |
| GREG OLESKEY AND ROGELIO SANCHEZ, Defendants | OF TRAVIS COUNTY, TEXAS |
| | 353RD JUDICIAL DISTRICT |

### CERTIFICATE

We, the jury have answered the above and foregoing questions as herein indicated, and herewith return same into Court as our verdict.

*(To be signed by the presiding juror, if unanimous:)*

_____
Presiding Juror

_____
Printed name of Presiding Juror

*(To be signed by those rendering the verdict, if not unanimous:)*

Jurors' Signatures:       Jurors' Printed Names:

| Signature | Printed Name |
|---|---|
| *Natalie Kleinecke* | NATALIE KLEINECKE |
| *Stephanie Chareot* | Stephanie Chareot |
| | Kyle Richards |
| | Jill Vogan |
| *Nancy Sayers* | Nancy Sayers |
| | Jan Troyer |
| *Cathi Boortz* | CATHI BOORTZ |
| | Hector Dominguez |
| *Luz M. Ramos* | Luz M. Ramos |
| *Charles McCormick* | Charles McCormick |

DATE: 11/20/15

12

243

CAUSE NO. D-1-GN-04-001222

| | | |
|---|---|---|
| LATISHA MCFADDEN | § | IN THE DISTRICT COURT |
| | § | |
| V. | § | 353RD. JUDICIAL DISTRICT |
| | § | |
| | § | TRAVIS COUNTY, TEXAS |
| GREG OLESKEY, ROGELIO SANCHEZ, | | |
| AND MICHAEL POLLARD | | |

## WRITTEN INSTRUCTIONS

**MEMBERS OF THE JURY:**

By the oath that you just took, you became an official of this court and an active participant in the public administration of justice. It is essential to the administration of fair and impartial justice that you follow these instructions:

1. To avoid looking like you are friendly with one side of the case, do not mingle with or talk to the lawyers, the witnesses, the parties or any other person who might be connected with or interested in this case. You cannot have even casual conversation about things completely unrelated to this suit with any of those people. Do not accept from or give to any of them any favors, however slight.

2. Do not discuss anything about this case or mention it to anyone, even your spouse or a friend, either in person or by any other means including by phone, text message, email message, chat room, blog, or social networking websites such as Facebook, Twitter, or Myspace. Do not let anyone discuss the case with you or in your presence. If anyone tries to talk about the case with you or in your hearing, report it to me as soon as possible. We do not want you to be influenced by something other than the evidence admitted in court.

3. Do not even discuss this case among yourselves until after you have heard all of the evidence, the court's charge, and the attorneys' arguments, and I have sent you to the jury room to begin your deliberations.

4. You are the judges of the facts of this case. It is your duty to listen to and consider carefully the evidence admitted under my rulings, and to answer some specific questions about the facts that I will submit to you in writing in the court's charge.

5. In arriving at your verdict, you can consider only the evidence admitted during the trial. Do not make any investigation on your own about the facts of this case. Do not try to get information about the case, lawyers, witnesses, or issues from outside this courtroom. Do not go to places mentioned in the case to inspect the places. Do not inspect items mentioned in this case unless they are presented as evidence in court. Do not look anything up in a law book, dictionary, or public record to try to learn more about the case. Do not look anything up on the Internet to try to learn more about the case.

6. Do not tell other jurors your own experiences or other people's experiences. For example, you may have special knowledge of something in the case, such as business, technical, or professional information. You may even have expert knowledge or opinions, or you may know what happened in this case or another similar case. Do not tell the other jurors about it. Telling other jurors about it is wrong because it means the jury will be considering things that were not presented in court. And do not let anyone else do any of these things for you.

This rule is very important because we want a trial based only on evidence presented in open court. Your conclusions about this case must be based only on what you see and hear in this courtroom because the law does not permit you to base your conclusions on information that has not been presented to you in open court. All the information must be presented in open court so the parties and their lawyers can test it and object to it. Information from other sources like the Internet

SCANNED

244

will not go through this important process in the courtroom. In addition, information from other sources could be completely unreliable. As a result, if you investigate this case on your own, you could compromise the fairness to all parties in this case and jeopardize the results of this trial.

7. The law is determined by the legislature and courts of this state. You are obligated to follow my instructions about the law, regardless of whether you think the law is right or wrong.

8. During the presentation of evidence, the attorneys may make legal objections. If an objection to a question is sustained, disregard the question, and do not speculate as to why it was asked or what the answer would have been. If an objection to a witness's answer is sustained, disregard that answer. It is not in evidence, and should not be considered. Do not speculate about or consider for any reason the objections or my rulings themselves.

9. Turn off all cell phones and other electronic devices. While you are in the courtroom and while you are deliberating, you may not communicate with anyone through any electronic device about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or Web site, through any Internet chat room, or by way of any other social networking Web sites, including Facebook, MySpace, LinkedIn, and YouTube. Do not post information about the case on the Internet before these court proceedings end and you are released from jury duty. Do not record or photograph any part of these court proceedings, because it is prohibited by law.

10. During the trial, if taking notes will help focus your attention on the evidence, you may take notes using the materials the court has provided. Do not use any personal electronic devices to take notes. If taking notes will distract your attention from the evidence, you should not take notes. Your notes are for your own personal use. They are not evidence. Do not show or read your notes to anyone, including other jurors. When you are released from jury duty, the Court Operations Officer will promptly destroy your notes so that nobody can read what you wrote.

I stress again that it is imperative that you follow these instructions, as well as any others that I may later give you. Keep your copy of these instructions, and refer to them should any question arise about the rules that govern your conduct during this trial. A violation of any instruction must be reported to me as soon as possible.

_Judge Orlinda Naranjo_

419th District Court

245

# Exhibit 3

# TEXAS
# PATTERN JURY CHARGES

General Negligence • Intentional Personal Torts

Workers' Compensation

Prepared by the

COMMITTEE

on

PATTERN JURY CHARGES

of the

STATE BAR OF TEXAS



Austin    2014

QUESTION _____

Did *Don Davis* maliciously prosecute *Paul Payne*?

"Malicious prosecution" occurs when one person initiates or procures, with malice, and without probable cause at the time the prosecution is commenced, the prosecution of an innocent person.

"Malice" means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful or wanton act.

"Probable cause" means the existence of such facts and circumstances as would excite belief in a person of reasonable mind, acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.

Answer "Yes" or "No."

Answer: _____

## COMMENT

**When to use.** PJC 6.4 is a broad-form question. *See* Tex. R. Civ. P. 277. It should be appropriate in most cases involving claims for malicious prosecution arising out of a criminal prosecution. See PJC 4.1 comments, "Broad form to be used when feasible" and "When broad-form questions not feasible."

**Source of question and instructions.** The seven elements of malicious prosecution are (1) commencement of a criminal prosecution against the plaintiff, (2) initiated or procured by the defendant, (3) terminated in favor of the plaintiff, (4) who was innocent, (5) without probable cause, (6) with malice, (7) resulting in damage to the plaintiff. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997). Note that the element relating to the prosecution's being terminated in favor of the plaintiff is not included in the above instructions. In the Committee's view, this element should be determined by the trial court as a matter of law before the submission of the case to the jury. *Cf. Davis v. City of San Antonio*, 752 S.W.2d 518, 523 (Tex. 1988). Under the supreme court's formulation in *Richey*, the plaintiff's innocence is a factual element that he bears the burden of establishing.

86

**Dispute about procurement or initiation.** In some situations there is a dispute about the procurement or initiation of the criminal prosecution. In the case of a dispute about "procurement," the following instruction may be used:

A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person fails to fully and fairly disclose all material information known to him or knowingly provides false information. A criminal prosecution may be procured by more than one person.

*King v. Graham*, 126 S.W.3d 75, 77 (Tex. 2003); *Browning-Ferris Industries, Inc. v. Lieck*, 881 S.W.2d 288, 293 (Tex. 1994). "Initiation would not ordinarily need to be defined, as it would be demonstrated by evidence that defendant filed formal charges against plaintiff . . . ." *Lieck*, 881 S.W.2d at 293.

**Exemplary damages.** A finding of malicious prosecution may support the submission of an exemplary damages question for causes of action accruing before September 1, 1995. *Ellis County State Bank v. Keever*, 936 S.W.2d 683 (Tex. App.— Dallas 1996, no writ). For causes of action accruing on or after September 1, 1995, a separate issue for exemplary damages must be submitted because of the burden of proof requirements for exemplary damages that were created by the 1995 amendment to chapter 41 of the Texas Civil Practice and Remedies Code. See PJC 4.2B. Further, for actions filed on or after September 1, 2003, the separate submission for exemplary damages must also account for the unanimity requirement created by the 2003 amendments to chapter 41. See PJC 4.2C. The practitioner should be aware, however, that there is otherwise little guidance in the case law for submissions in this area.

# Exhibit 4

| Vernon's Texas Rules Annotated |
| --- |
| Texas Rules of Evidence (Refs & Annos) |
| Article IV. Relevance and Its Limits (Refs & Annos) |

TX Rules of Evidence, Rule 401

Rule 401. Test for Relevant Evidence

Currentness

Evidence is relevant if:

**(a)** it has any tendency to make a fact more or less probable than it would be without the evidence; and

**(b)** the fact is of consequence in determining the action.

**Credits**
Eff. March 1, 1998. Amended by orders of Supreme Court March 10, 2015 and Court of Criminal Appeals March 12, 2015, eff. April 1, 2015.

Notes of Decisions (215)

Rules of Evid., Rule 401, TX R EVID Rule 401
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through April 1, 2016. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through April 1, 2016. Other state court rules and selected county rules are current with rules verified through April 1, 2016.

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 5

> Vernon's Texas Rules Annotated
> Texas Rules of Evidence (Refs & Annos)
> Article IV. Relevance and Its Limits (Refs & Annos)

TX Rules of Evidence, Rule 402

Rule 402. General Admissibility of Relevant Evidence

Currentness

Relevant evidence is admissible unless any of the following provides otherwise:

- the United States or Texas Constitution;

- a statute;

- these rules; or

- other rules prescribed under statutory authority.

Irrelevant evidence is not admissible.

**Credits**
Eff. March 1, 1998. Amended by orders of Supreme Court March 10, 2015 and Court of Criminal Appeals March 12, 2015, eff. April 1, 2015.

Notes of Decisions (724)

Rules of Evid., Rule 402, TX R EVID Rule 402
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through April 1, 2016. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through April 1, 2016. Other state court rules and selected county rules are current with rules verified through April 1, 2016.

End of Document
© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 6

> **Vernon's Texas Rules Annotated**
>   **Texas Rules of Evidence (Refs & Annos)**
>     **Article IV. Relevance and Its Limits (Refs & Annos)**

## TX Rules of Evidence, Rule 403

## Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, or Other Reasons

### Currentness

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence.

**Credits**
Eff. March 1, 1998. Amended by orders of Supreme Court March 10, 2015 and Court of Criminal Appeals March 12, 2015, eff. April 1, 2015.

Notes of Decisions (1679)

Rules of Evid., Rule 403, TX R EVID Rule 403
Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through April 1, 2016. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through April 1, 2016. Other state court rules and selected county rules are current with rules verified through April 1, 2016.

---

End of Document © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 7

Vernon's Texas Rules Annotated
  Texas Rules of Evidence (Refs & Annos)
    Article IV. Relevance and Its Limits (Refs & Annos)

TX Rules of Evidence, Rule 404

Rule 404. Character Evidence; Crimes or Other Acts

Currentness

**(a) Character Evidence.**

**(1)** *Prohibited Uses.* Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait.

**(2)** *Exceptions for an Accused.*

**(A)** In a criminal case, a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it.

**(B)** In a civil case, a party accused of conduct involving moral turpitude may offer evidence of the party's pertinent trait, and if the evidence is admitted, the accusing party may offer evidence to rebut it.

**(3)** *Exceptions for a Victim.*

**(A)** In a criminal case, subject to the limitations in Rule 412, a defendant may offer evidence of a victim's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it.

**(B)** In a homicide case, the prosecutor may offer evidence of the victim's trait of peacefulness to rebut evidence that the victim was the first aggressor.

**(C)** In a civil case, a party accused of assaultive conduct may offer evidence of the victim's trait of violence to prove self-defense, and if the evidence is admitted, the accusing party may offer evidence of the victim's trait of peacefulness.

**(4)** *Exceptions for a Witness.* Evidence of a witness's character may be admitted under Rules 607, 608, and 609.

**(5)** *Definition of "Victim."* In this rule, "victim" includes an alleged victim.

**(b) Crimes, Wrongs, or Other Acts.**

**(1)** *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

**(2)** *Permitted Uses; Notice in Criminal Case.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence--other than that arising in the same transaction--in its case-in-chief.

## Credits

Eff. March 1, 1998. Amended by orders of Supreme Court March 10, 2015 and Court of Criminal Appeals March 12, 2015, eff. April 1, 2015.

Notes of Decisions (1914)

Rules of Evid., Rule 404, TX R EVID Rule 404

Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through April 1, 2016. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through April 1, 2016. Other state court rules and selected county rules are current with rules verified through April 1, 2016.

End of Document

# Exhibit 8

2/4/2016 5:22:14 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-04-001222
Patricia Winkler

CAUSE NO. D-1-GN-04-001222

| | | |
|---|---|---|
| LATISHA MCFADDEN | § | IN THE DISTRICT COURT |
| Appellant, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| GREG OLESKY, and | § | |
| ROGELIO SANCHEZ | § | |
| Appellees | § | 353RD JUDICIAL DISTRICT |

## STIPULATION OF THE PARTIES TO CORRECTION OF INACCURACIES IN REPORTER'S RECORD

**TO THE HONORABLE JUDGE OF SAID COURT:**

Under Rule 34.6 (e)(1) of the Texas Rules of Appellate Procedure, Latisha McFadden, Appellant, and Greg Olesky and Rogelio Sanchez, Appellees, by and through their respective attorneys of record, agree to correct the following inaccuracies in the reporter's record without the court reporter's recertification: On page 5 of the Reporter's Record of the Jury Charge Conference of November 19, 2015, there is a 12-minute gap in the record.

The Parties agree that during these 12 minutes, argument continued on the record and the parties debated whether the good-faith defense should be Issue No. 1 in the jury charge or whether malicious prosecution should be Issue No. 1. Counsel for Appellees argued as to why the good-faith defense should be the first issue considered by the jury and malicious prosecution the second, arguing, among other things, that because there is

a rebuttable presumption of good faith, that question should be decided first. Counsel for Appellant argued why malicious prosecution should be the first issue and good-faith the second, arguing, among other things, that the pattern jury charge on malicious prosecution dealt exclusively with the tort, which showed that it was the first concern of the law, and that the idea of making good-faith the first question would be putting things backwards.

The Parties agree that Counsel for Appellant made objection to the Court's ruling that the good-faith defense would be the first jury question, in timely and plain manner, specifically on the grounds that under the pattern jury charges and the law the first issue must be about the tort of malicious prosecution. Counsel obtained a ruling on his objection in that said objection was overruled by the Court on the record.

Mr. Gray Laird, counsel for Appellees, is in trial this 4th day of February, 2016, but has this day given expressed permission to Mr. Donald McCarthy, counsel for Appellant, to sign this stipulation on Mr. Laird's behalf.

Respectfully submitted,

_____

Donald J. McCarthy
The Law Office of Donald J. McCarthy
S.B.N. 00794256
808 W. 11th Street
Austin, Texas 78701
(512) 585-9151
(512) 477-1901 (FAX)

ATTORNEY FOR APPELLANT


_____ by Permission

Henry Gray Laird
CITY OF AUSTIN LAW DEPARTMENT
S.B.N. 24087054
P.O. Box 1088
Austin, Texas 78767
(512) 974-1342
(512) 974-2894 (FAX)

ATTORNEY FOR APPELLEES

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was delivered to counsel for Appellees, Mr. Gray Laird, Assistant City Attorney, Austin, by agreement by electronic mail to gray.laird@austintexas.gov and Ms. Andralee Lloyd to andralee.lloyd@ austintexas.com this 4th day of February, 2016.

*Donald McCarthy*
Donald J. McCarthy